UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIO WILLIAMS, AKA BOBBY MIMS,
#428838,

        Petitioner,                Case Number 12-12155
                                                     Honorable Nancy G. Edmunds

v.

STEVEN RIVARD,

        Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND (3) DENYING PERMISSION TO PROCEED IN FORMA PAUPERIS ON APPEAL**

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was found guilty after a jury trial in the Washtenaw Circuit Court of second-degree murder, MICH. COMP. LAWS § 750.317, and resisting arrest, MICH. COMP. LAWS § 750.81(d). The trial court sentenced him to 30-to-87½ years in prison for the murder conviction and a concurrent 1-to-15 year term for the resisting arrest conviction. The petition raises three claims: (1) the trial court erred in failing to direct a verdict of not guilty as to the charge of first-degree murder; (2) the trial court erred in allowing audio tapes to be played before the jury to refresh witnesses' recollections; and (3) the trial court inadequately instructed the jury on the defense of accident. The petition will be denied because none of Petitioner's claims merit relief. The Court will also deny Petitioner a certificate of appealability and permission to proceed in forma pauperis on appeal.

I. Background

This Court recites verbatim the relevant facts relied upon by the Michigan Court of

Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

> This case arises out of the killing of Bobby Mims, who was defendant's brother, by a single stab wound to the chest. [FN 1] On October 17, 2008, Jessica Harold, who was defendant's long-time girlfriend, Latoya Daniels, defendant, Mims, and Bennie Easley were at Easley's home late in the evening celebrating Harold's birthday. The evidence established that everyone was drinking and that they were all intoxicated. There is no indication of any altercations between persons in the group while at Easley's home. The group then left Easley's home and went to a local bar, where they met a couple of other friends and saw people from school. While at the bar, Harold spoke with some men, and this led to a heated argument and near fight between defendant and the unidentified males. Defendant, Harold, and Daniels then left the bar in Daniels' vehicle, with Harold driving, defendant in the backseat, and Daniels in the passenger seat. They headed to Harold's apartment.
>
> According to recorded statements made by Harold and Daniels to the police, defendant and Harold were arguing and yelling at each other in the car and defendant physically struck Harold. According to the same recorded statements, on arrival at Harold's apartment, defendant and Harold were still arguing and yelling at each other and defendant again hit Harold. When testifying at trial, both Harold and Daniels acknowledged that defendant and Harold had been arguing and yelling, but they claimed that defendant never struck or punched Harold. When the prosecutor used the audiotapes of their police statements to, as framed by the prosecutor, "refresh their memories," the tapes were played in open court. Our only knowledge of the contents of the tapes is based on the prosecutor's commentary built into follow-up questions on the continuing examinations of Harold and Daniels. [FN3] With respect to their statements to police, Harold and Daniels testified that they were intoxicated and did not recall making the statements, although they conceded that it was their voices on the audiotapes. The record does not reflect that the audiotapes were admitted into evidence at trial.
>
> Because of the ongoing altercation between Harold and defendant, someone contacted Mims and Easley by phone to let them know what was transpiring. By now, Mims and Easley had left the bar and were at a McDonalds Restaurant, and they had planned to go back to Easley's home. Mims insisted that they now go to Harold's apartment because of the fight between defendant and Harold. Mims did not want his brother, defendant, to end up in jail again. There was evidence that Mims and defendant had a close relationship and loved and looked out for each other, but they did occasionally engage in fights when intoxicated. Defendant was older than

Mims. There was evidence that defendant stands about 5'10" and weighs 150 pounds, while Mims stood about 5'9" and weighed 250 pounds. Defendant testified that when they fought, in states of intoxication, no one ever suffered a physical injury and that Mims usually got the better of defendant in fights because of Mims's superior size.

Back at Harold's apartment, which had a lower, main, and upper level, defendant and Harold were yelling at each other, and defendant ended up smashing Harold's cell phone. Defendant admitted on the stand that he broke the cell phone, but denied ever hitting Harold. He also tore up some money and flushed it down the toilet; however, defendant testified that it was his own money. Daniels testified that she observed defendant tearing up Harold's money and flushing it down the toilet, but she claimed that she did not see defendant break Harold's cell phone; she only heard something breaking. The prosecutor then played an audiotape in which Daniels informed the police that she observed defendant breaking Harold's phone. Again, Daniels, while acknowledging her voice on the tape, stated that she had no recollection of making the statement. [FN 4] Eventually, Harold was upstairs in the apartment, and defendant and Daniels were in the kitchen on the main level, with Daniels sitting on a stool. At this point, Mims and Easley arrived at Harold's apartment. They first checked on Harold upstairs, and she was crying. Different versions were given regarding the events that next transpired.

According to Daniels, Mims came down the stairs to the main level and headed toward the kitchen, all the while yelling and cussing out defendant, calling him a dummy and stupid. Daniels testified that Easley tried to hold Mims back, half-heartedly, as he headed toward defendant, and defendant moved to the area of the sink in the kitchen. Mims was angry and enraged and was able to maneuver around Easley. Mims then approached defendant. Daniels stated that defendant proceeded to hit Mims in the chest with his fist, but she also testified that she then observed blood coming from Mims's chest. Daniels claimed that she saw no weapons being handled by either defendant or Mims, that Mims was trying to get defendant when defendant hit Mims, that she did not see Mims strike defendant, that defendant did not appear as if he wanted a confrontation until Mims came towards him, and that defendant's "punch" appeared to be a defensive move on defendant's part. Daniels did not recall Mims saying anything after the punch, and, when confronted by the prosecutor, she asserted that she did not remember making a statement to police that Mims stated, "n****r just stabbed me in my heart." According to Daniels, the wounded Mims went upstairs and was bleeding, wheezing, and panting. Daniels then hopped in her car and drove off, but she eventually returned to the crime scene after a friend pleaded with her to do so. Daniels testified that she never talked to anyone upon her return to the scene, but, after then going home, she later

3

went to the Ypsilanti Police Department and talked to police in the early morning of October 18.

      According to Easley, at the point in which Mims was consoling Harold upstairs, Mims exclaimed that Harold did not deserve what defendant did to her, and Mims was becoming very angry. Easley testified that Mims was tired of defendant always screwing up and tired of cleaning up defendant's messes. Easley indicated that Mims yelled that he was about to beat defendant's ass. Somewhere around a landing between the main and upper levels of the apartment, Easley grabbed hold of Mims and tried to calm him down. After a few minutes, Mims told Easley that he was calm and would not do anything. Easley testified that he then let go of Mims, at which time Mims proceeded to the kitchen area and Easley remained behind with Harold. A few minutes later, Mims returned and started stumbling up the stairs, muttering, "Damn, you gonna stab me." Mims went to a bathroom upstairs and removed his shirt. Harold started to treat Mims's knife wound, putting pressure on the wound. Easley called 911, and when Mims started going downstairs, he collapsed on the landing. Easley testified that, from his vantage point, he could not see the stabbing or the actual confrontation between defendant and Mims, nor did Easley recall ever seeing Daniels. Easley stated that Mims had no weapons, and he did not witness Mims striking defendant. Easley told the 911 operator and later a detective that he did not know who stabbed Mims.

      According to Harold, she was upstairs or in the stairwell when the stabbing occurred and she did not witness the altercation between defendant and Mims. Harold testified that she had been crying and sitting with Mims before he headed downstairs toward the kitchen. Mims was yelling at defendant. The next time she saw Mims, he had been stabbed, and she treated his wound, resulting in her jacket being covered in blood. Harold did not see any weapons on the night of the incident.

      Defendant testified that, while he was in the kitchen "chilling," Mims came running down the stairs heading to the kitchen, yelling that he was going to "f**k" defendant up and that he was going to beat defendant's ass. He never observed Easley grabbing hold of Mims. According to defendant, when Mims was almost upon him, defendant punched him in the chest. Defendant claimed that Mims was holding a knife, which is something that defendant had never seen before. Defendant was fearful for his life. The two began to tussle and fell to the floor, at which point Mims indicated that he had been stabbed. Defendant testified that he never touched the knife. Consistent with a 911 tape played for the jury, defendant stated that he twice told the 911 operator that he had stabbed his brother, but he testified that it was accidental and that he punched and tussled with Mims in selfdefense. Defendant conceded that he did not tell the 911 operator that it was an

4

accident or done in self-defense. Defendant explained that he later ran from the police because he was scared and because he feared that the police would screw up the investigation and improperly accuse him of a crime.

There was police testimony that a knife with blood on it was found in the kitchen or living room area, that there was no effort to lift fingerprints from the knife because one of the group's friends had arrived and picked up the knife, that blood was found on the main level of the home and on Mims's shirt, that the knife blade matched the hole in Mims's shirt, that Harold and Daniels were not intoxicated by the time they spoke to the police, that Harold told police that Mims had asked defendant before the knifing how he could put his hands on Harold, that Mims was found in the apartment when police arrived, being cradled in Harold's arms, and that no weapons were found on Mims. There was also police testimony that when they arrived, a person was outside the apartment waiving them to Harold's unit. After police entered the apartment and determined what occurred, they became suspicious and deduced that the person they saw on arrival was defendant. The police began a search of the grounds around the apartment complex and spotted defendant. However, he was able to escape on foot. Defendant turned himself in to police about a month later with the assistance of his attorney.

The chief medical examiner testified that Mims died of a single stab wound to the left and center side of his chest, below the left collarbone. The depth of the stab wound was three inches into the chest. The knife perforated the sac surrounding the heart, a thoracic artery, and the right ventricle. The medical examiner testified that Mims was stabbed in a downward motion, with the sharp edge of the blade pointing downward. He opined that the stabbing occurred when Mims and the perpetrator were standing upright. On cross-examination, the medical examiner testified that it was possible, based on the nature of the wound, that the stabbing occurred by Mims falling on the knife during a fight between Mims and the perpetrator.

[FN 1] As reflected in this opinion's caption, defendant, in the past, had used his brother's name as an alias.

[FN 2] Daniels did testify that, before entering Harold's apartment, Harold and defendant were tussling and shoving and pushing each other, but defendant did not use his fists to hit Harold. Harold testified that she busted her lip, but this occurred because she fell down some steps, not from being struck by defendant.

[FN 3] There were no transcripts made of the taped police statements, and the trial transcripts do not include any verbatim communications made on the tapes, only references to the fact that the tapes were played in court.

> [FN 4] Harold testified that she knew nothing about any money being torn, nor did she observe anyone breaking her phone, although she assumed defendant did it.

*People v. Williams*, No. 293896, 2010 WL 5175460, at *1-3 (Mich. Ct. App. Dec. 21, 2010).

Following his conviction, Petitioner filed a direct appeal in the Michigan Court of Appeals, raising the same three claims that form the basis of the instant petition. The Michigan Court of Appeals affirmed in an unpublished opinion. *Id.*

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court which raised the same claims as in the Michigan Court of Appeals. The Michigan Supreme Court denied the application by form order. *People v. Williams*, 798 N.W.2d 786 (Mich. 2011)(table).

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set

of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)((quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)(per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)(citing *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.*

"[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington,*

131 S. Ct. at 786. Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. Id. Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. (citing Jackson v. Virginia, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." Woodford, 537 U.S. at 24. Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-87.

### III. Discussion

A. Failure to Grant Directed Verdict

Petitioner first claims that the trial court erred when it denied his motion for a directed verdict as to the first-degree murder charge at the close of the prosecution's case. Petitioner asserts that there was no evidence offered at trial to suggest that he murdered his brother with premeditation and deliberation. The Michigan Court of Appeals viewed this claim as presenting a close question, but it found that viewed most favorably to the prosecution, there was sufficient evidence of premeditation and deliberation. The state

court noted that a jury could infer that Petitioner armed himself prior to the fatal confrontation when he knew his brother was enraged, and that he therefore had adequate time to premeditate and deliberate about whether to stab him in the chest prior to the victim's entrance into the kitchen. This Court need not enter into the debate as to whether the evidence was sufficient to instruct the jury on first-degree murder because the claim cannot be supported by clearly established Supreme Court law.

Petitioner is entitled to habeas relief only if he can establish that his conviction and incarceration violates clearly established federal law as articulated by the United States Supreme Court. The Supreme Court has long held that every criminal defendant has a right not to be convicted of a crime unless there exists evidence "sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged." *In re Winship*, 397 U.S. 358, 363. But as several courts have recognized, "the Supreme Court has never held that the submission of a charge, upon which there is insufficient evidence, violates a defendant's constitutional rights where the defendant is acquitted of that charge." *Thomas v. Bell*, 2008 U.S. Dist. LEXIS 6209, 2008 WL 268892 at *5 (E.D. Mich., Jan. 29, 2008) (citations omitted); *Olivo v. Lafler*, 2007 U.S. Dist. LEXIS 44032, 2007 WL 1747154 at *3 (E.D. Mich., June 18, 2007) (recognizing that "a number of cases have held that the submission to a jury of a criminal charge constitutes harmless error where the habeas petitioner is acquitted of that charge") (citations omitted); *Calderon-Hernandez v. Trombley*, 2007 U.S. Dist. LEXIS 86972, 2007 WL 4181274 at *5 (E.D. Mich., Nov. 27, 2007) (same) (citations omitted).

Because Petitioner was acquitted of first-degree murder, Petitioner cannot establish that the submission to the jury of that charge to the jury violates clearly established law as

9

articulated by the United States Supreme Court.

B. Refreshing Recollection of Witnesses with Audio Tape

Petitioner's second claim asserts that the trial court erred in allowing the prosecutor to use the audiotapes from witness interviews with the police to refresh their recollection about what occurred on the night of the incident. The Michigan Court of Appeals found that this use of the tapes was improper to refresh recollections, but that because the witnesses' statements on the tape contradicted their trial testimony, that the tapes were properly admitted as prior inconsistent statements under Michigan Rule of Evidence 613(b).

The state court's conclusion that the tapes were properly played under a state evidentiary rule precludes habeas relief. As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). The propriety of a state court ruling that evidence was properly admitted under Rule 613(b) involves only a question of state law that is not cognizable on federal habeas review. *Cathron v. Jones*, 77 Fed. Appx. 835, 843,

n. 4 (6th Cir. 2003); see also *Roland v. Mintzes*, 554 F. Supp. 881, 890 (E.D. Mich. 1983) (alleged misapplication of state law in impeachment by prosecutor of petitioner's accomplice with prior inconsistent statements was not cognizable in federal habeas corpus proceedings).

Therefore, Petitioner's second claim does not raise a cognizable issue and cannot form a basis for granting habeas relief.

C. Erroneous Jury Instruction on Accident Defense

Petitioner's third claim asserts that the trial court's jury instruction on the defense of accident was insufficient. Respondent argues that review of the claim is barred because Petitioner's trial counsel stated his satisfaction with the jury instructions.

Federal habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. See *Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977). The doctrine of procedural default is applicable when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); see also *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir. 2001).

Here, the Michigan Court of Appeals relied upon a state procedural bar — Petitioner's acceptance of the jury instructions as given — which the court found to constitute a waiver of this issue. See *Williams*, 2010 WL 5175460, at *11-12. The failure to make a contemporaneous objection or request is a recognized and firmly-established independent and adequate state law ground for refusing to review trial errors. See *People*

*v. Carines*, 460 Mich. 750, 763 (1999); see also *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). In this case, the Michigan Court of Appeals denied relief based on Petitioner's acceptance of the jury instructions, i.e., his failure to object to those instructions at trial.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. See *Coleman*, 501 U.S. at 753; *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996). Petitioner neither alleges nor establishes cause to excuse this procedural default. A federal habeas court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default. See *Smith v. Murray*, 477 U.S. 527, 533 (1986). The only logical candidate for a cause argument would be an assertion that trial counsel was ineffective for agreeing to the instructions, but because Petitioner did not exhaust such an ineffective assistance of counsel claim in the state courts, he is barred from presenting it to this Court. See *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000).

In any event, any error was harmless. *Hereford v. Warren*, 536 F.3d 523, 532-33 (6th Cir. 2008). Petitioner testified that he was unsure how his brother was stabbed, and but he indicated that it happened accidentally as the two men fell to the floor during the struggle. Tr. 7-7-09, 90-91. On cross-examination, Petitioner also indicated that he acted in self-defense during the confrontation. Id. 99. The testimony was unclear, however, about whether his self-defense statement referred to the fight generally, the punch, or the stabbing. The accident instruction consisted of a single, unhelpful sentence: "The Defendant says he is not guilty of murder because Bobby Mims' death was accidental." T

7-7-09, 182-183. The jury was also instructed, however, that to find Petitioner guilty of murder, "[d]efendant had one of three states of mind: He intended to kill, or he intended to do great bodily harm to Bobby Mims, or he knowingly created a very high risk of death or great bodily harm knowing that death of such harm would be the likely result of his actions." Id., 180-181.

When an intentional act must be established as an element of a crime – as is the case with second-degree murder – satisfying the elements of the crime logically precludes an accident defense. See *People v. Hess*, 214 Mich. App. 33, 37 (1995). That is, for crimes such as murder, accident is not properly regarded as an affirmative defense, but rather, it constitutes the negation of an element. The jurors in Petitioner's case were instructed on the elements of second-degree murder, including the requirement that Petitioner's act be intentional. Jurors are presumed to follow their instructions. *Blueford v. Arkansas*, ___ U.S. ___, 132 S. Ct. 2044, 2051, 182 L. Ed. 2d 937 (2012). Here, by finding Petitioner guilty of second-degree murder, the jury necessarily found that Petitioner committed an intentional act. It follows logically that they necessarily found that the killing was not accidental. Therefore, any error in failing to further define the accident defense was harmless.

Petitioner has also not shown that a failure to review his defaulted claim would result in a fundamental miscarriage of justice. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. See *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998). "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence — whether it be

exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner makes no such showing. This claim is barred by procedural default.

### IV. Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473 (2000). The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. The Court will also deny Petitioner permission to proceed on appeal in forma pauperis because any appeal of this decision would be frivolous

### V. Conclusion

Accordingly, the Court **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus. The Court further **DENIES** a certificate of appealability and permission to proceed on appeal in forma pauperis.

**SO ORDERED.**

S/Nancy G. Edmunds  
Nancy G. Edmunds  
United States District Judge

Dated: October 31, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 31, 2013, by electronic and/or ordinary mail.

                                        S/Johnetta M. Curry-Williams
                                        Case Manager
                                        Acting in the Absence of Carol A. Hemeyer